

**NUMBER 13-08-114-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI ‑ EDINBURG

---

**SAMUEL RODRIGUEZ REYNA,**                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                   **Appellee.**

---

**On appeal from the 319th District Court
of Nueces County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Benavides, Vela, and Perkes
Memorandum Opinion by Justice Vela**

A jury found appellant, Samuel Rodriguez Reyna, guilty of murder. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2003). After finding he had a previous felony conviction, the jury assessed punishment at ninety-nine years' imprisonment. In eleven issues, Reyna argues: (1) the evidence is insufficient to support his conviction; (2) various witnesses committed aggravated perjury; (3) the testimony of several witnesses

was inadmissible; (4) the State's improper investigation denied him due process and a fair trial; and (5) the trial court abused its discretion in denying his pretrial application for writ of habeas corpus and his motion to suppress his video-taped statement.   We affirm.

## I. Factual Background

On July 25, 2006, Kimberly Powell, Samuel Reyna, and Ricardo Reyes were drinking beer in a vacant lot on Corpus Christi's Leopard Street.   Paul Licoscos and his girlfriend, Debra Oscar, were also drinking beer in the lot.   Powell testified that because Oscar was intoxicated, Reyna told Licoscos, "'You need to take care of her[.]'"   At that point, Reyna and Licoscos started fighting, and after Powell broke it up, the two shook hands.   Afterwards, Powell left to buy more beer.   Upon returning, she saw Reyna and Licoscos staring at each other.   She walked away from them, and when she turned around, she "saw Sammy [Reyna] start stabbing him [Licoscos] in the back."   Unable to pull Reyna away from Licoscos, Powell ran behind a nearby Shell station and waited for Reyna to leave the area.   After he left, she checked on Licoscos and then called 9-1-1.

Powell testified that because she was afraid of Reyna, she told the police that the suspect was a "black man."   Later, the police showed her a photo line-up, and she identified Reyna as the person who stabbed Licoscos.

On cross-examination, Powell testified that "[t]here was no lighting" at the crime scene and that she had been drinking the night of the murder.   She stated that when she called 9-1-1, she identified the suspect as "[a] black man with a blue shirt and brown 'buckles.'"   When asked about the weapon, which the killer used to stab Licoscos, she testified that even though she could not identify the weapon, she "could . . . see the

2

weapon."

Michelle Robertson arrived at the vacant lot shortly before the stabbing. At some point, she saw Reyna with a knife. When the prosecutor asked her, "[D]id the defendant [Reyna] say anything to you after you saw the knife about what he was going to do to Paul [Licoscos]?", she replied, "He said he was gonna kill the motherf—." Then, she saw Reyna stab Licoscos about six or seven times with the knife.

Officer Macedonio Rodriguez, the first officer to arrive at the scene, found Licoscos's body in the vacant lot. He testified that Powell, who did not appear to be intoxicated, described the suspect as "a black male, 38 to 40 years of age, about five foot eight; . . . wearing shorts, a jersey, Addida [sic] shoes; and that . . . he used a pair of scissors in the assault."

Officer Crispin Mendez arrived at the scene shortly after Officer Rodriguez. He testified that Powell, who was afraid to talk to him, said that a "black male went after the victim with some scissors and began to stab him." She also told him the suspect chased her and that she ran across the street because she was afraid of him.

Detective R.L. Garcia, who investigated the murder, testified that Powell gave "varying statements about the identity" of the suspect. When he spoke to her again, she said the suspect's name was "Samuel Rodriguez" and that she initially lied about the suspect's identity because she "was a street person that was scared of the suspect." When Detective Garcia showed her the photo line-up, she identified suspect number five, who is "Samuel Rodriguez Reyna."

3

Detective T.K. Revis testified that after the murder, Powell gave him a statement in which she lied about the suspect's age, clothing, and race. Later, however, she told him she had lied about the suspect's description because "she was scared of retaliation from Mr. Reyna." She gave Detective Revis another statement in which she identified Samuel Reyna as the murderer. Detective Revis also testified that Powell identified Reyna from a photo line-up. He had no information that either Debra Oscar or Ricardo Reyes were involved in the murder.

In the morning following the murder, Officer Kevin Felt was on patrol and saw Reyna standing on a sidewalk near Omaha Street. Officer Felt pulled up next to him and asked him his name. Reyna identified himself, walked up to Officer Felt's squad car, and said, "'I'm Samuel Reyna. I hear you're looking for me.'" He asked Reyna if he had any weapons and then tried to pat him down. At that point, Reyna reached into his right front pocket, and Officer Felt "grabbed [Reyna's] hand, and removed with his hand a knife" from Reyna's pocket. Officer Felt described the knife as a "[b]lack folding knife, probably around three inches long." He put Reyna in the back seat of his squad car and notified Detective Garcia, who came to the scene and identified himself to Reyna. Detective Garcia testified that Reyna asked him, "'Do you want to talk to me about the fight or the stabbing?'" Reyna agreed to go to the police station and talk to him about the incident.

While at the police station, Detectives Garcia and Revis interviewed Reyna. The interview was recorded[1] and played to the jury during the guilt-innocence phase. The videotape showed that Reyna told the detectives he had nothing to say about what

---

[1] During the guilt-innocence phase, the prosecutor introduced the videotape of Reyna's interview into evidence as State's exhibit 103.

4

happened between him and Licoscos. Afterwards, they stopped the interrogation and arrested Reyna pursuant to an arrest warrant.

Cynthia Morales, a forensic scientist with the Texas Department of Public Safety crime lab, tested a blood sample removed from the blade of the knife that Officer Felt took from Reyna's pocket. Morales testified the DNA profile from this blood sample was consistent with Licoscos's DNA profile. She said the DNA profile found on Reyna's belt was consistent with Licoscos's DNA profile. On Reyna's shoes, she found a mixture of blood consistent with the DNA profiles of Reyna and Licoscos. She said that on one of Reyna's socks, "the DNA profile was consistent with a mixture from Samuel Reyna and Paul Licoscos."

Dr. Rey Fernandez, the pathologist who performed Licoscos's autopsy, testified that Licoscos had four stab wounds on the front chest area and four stab wounds "at the back." He stated, "These would be the type that I would expect from a sharp-edged weapon like a knife." He said the fatal-type wounds punctured Licoscos's lungs and liver. He testified that the cause of death was "multiple stab wounds."

The defense did not call any witnesses to testify at the guilt-innocence phase.

## II. DISCUSSION

### A. Evidentiary Sufficiency

In issue one, Reyna contends that the evidence is factually insufficient to support his conviction. The court of criminal appeals has held that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (overruling

*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)); *id.* at 926 (Cochran, J., concurring). Thus, the *Jackson v. Virginia* sufficiency standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* at 895; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Therefore, we will review Reyna's sufficiency challenge by applying the standard of review set out in *Jackson*. *See Pomier v. State*, 326 S.W.3d 374, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (applying a single standard of review required by *Brooks*).

### 1. Standard of Review

"When reviewing a case for legal sufficiency, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Winfrey v. State*, 323 S.W.3d 875, 878–79 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, "we 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Id.* at 879 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). "It has been said quite appropriately, that '[t]he appellate scales are supposed to be weighted in favor of upholding a trial court's judgment of conviction, and this weighting includes, for example, the highly deferential standard of review for legal-sufficiency claims.'" *Id.* (quoting *Haynes v. State*, 273 S.W.3d 183, 195

6

(Tex. Crim. App. 2008) (Keller J., dissenting) (citing *Jackson*, 443 U.S. at 319)). "We must therefore determine whether the evidence presented to the jury, viewed in the light most favorable to the verdict, proves beyond a reasonable doubt that appellant" committed the crime for which the jury found him guilty. *See id.* "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Id.* at 882 (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). In addition, "'[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict].'" *Id.* (quoting *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992)), *superseded in part on other grounds*, *Herrin v. State*, 125 S.W.3d 436, 443 (Tex. Crim. App. 2002).

### 2. Applicable Law and Analysis

A person commits the offense of murder if he intentionally or knowingly causes the death of another. TEX. PENAL CODE ANN. § 19.02(b)(1). In this case, the medical evidence showed Licoscos died from multiple stab wounds. These wounds were the type produced by a sharp-edged weapon like a knife. Both Powell and Robertson saw Reyna stab Licoscos several times, and Robertson saw that Reyna used a knife to stab him. In the morning following Licoscos's murder, a knife was taken from Reyna's pocket. Its blade tested positive for blood, and the DNA profile from this blood was consistent with Licoscos's DNA profile.

Even though Powell initially lied to the 9-1-1 operator and to the police about the suspect's identity, an appellate court must be "deferential to the jury's determination of

7

witness credibility. . . ." *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). "What weight to give contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor." *Id.* at 408–09. The jury could have reasonably chosen to disbelieve Powell's statements to the police that the suspect was a black man who used scissors to stab the victim and to believe her testimony at trial that she had seen Reyna stab Licoscos. *See id.* In addition, the evidence showed that Reyna left the crime scene after stabbing Licoscos. "Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn." *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). Thus, the jury could reasonably have considered Reyna's flight as incriminating circumstantial evidence.

Viewing all of the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient to support the jury's finding that Reyna intentionally or knowingly caused the death of Paul Licoscos. Accordingly, we overrule the first issue.

## B. Alleged Perjured Testimony

In issues two through five, Reyna contends Kimberly Powell, Michelle Robertson, Detective Revis, and Detective Garcia committed aggravated perjury while testifying during the guilt-innocence phase of his trial. Rule 33.1 of the Texas Rules of Appellate Procedure governs preservation of error, and states, in part:

> (a) In General.–As a prerequisite to presenting a complaint for appellate review, the record must show that:
>
>> (1) the complaint was made to the trial court by a timely request, objection, or motion that:
>>
>>> (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make

the trial court aware of the complaint, unless the specific grounds were apparent from the context;

TEX. R. APP. P. 33.1.

This rule encompasses the concept of "party responsibility." *Reyna v. State*, 168 S.W.3d 173, 176 (Tex. Crim. App. 2005). In other words, "[t]he complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale." *Id.* at 177. "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena v State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). This method gives the trial court and the opposing party a chance to correct the error. *Id.* "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial. In making this determination, we consider the context in which the complaint was made and the parties' shared understanding at that time." *Id.* (footnote omitted).

During the time that these four witnesses testified, defense counsel made no objections that any part of their testimony constituted either perjury or aggravated perjury. Consequently, the complaints are not preserved for appellate review. *See* TEX. R. APP. P. 33.1. In addition, there is no evidence in the record to show that these four witnesses were lying. Issues two through five are overruled.

## C. Admission of Testimony Under Rule 609(a)

In issues six and eight, Reyna contends that the testimony of Michelle Robertson and Kimberly Powell was inadmissible under Texas Rule of Evidence 609(a). Rule 609(a) allows a person to impeach a witness's credibility with evidence of the witness's conviction for a felony or a crime involving moral turpitude. *See* TEX. R. EVID. 609(a). Robertson testified she was presently on felony probation for possession of a controlled substance and tampering with evidence. She had three prior felony convictions in Louisiana that included "two drug charges and one damaging government property." On cross-examination, she stated she had been "charged with prohibited substance in a correctional facility" and that she had also been "charged" with two counts of prostitution.

Nothing in the record indicates defense counsel was prevented from impeaching Robertson's credibility with either her prior felony convictions or any other charges that were brought against her. In addition, nothing in the record indicates defense counsel was prevented from impeaching Powell's credibility with any prior conviction that she may have had. Thus, there was no violation of rule 609(a). Issues six and eight are overruled.

## D. Admission of Testimony Under Rule 613(b)

In issue seven, Reyna contends Michelle Robertson's testimony was inadmissible under Texas Rule of Evidence 613(b). "Rule of Evidence 613(b), which creates an exception to Rule 608(b),[2] provides that a witness may be impeached by using extrinsic evidence to show bias or interest." *Billodeau v. State*, 277 S.W.3d 34, 40 (Tex. Crim.

---

[2] "Rule of Evidence 608(b) provides that a witness's credibility may not be impeached with specific instances of the witness's conduct other than a criminal conviction as provided in rule 609(a)." *Billodeau v. State*, 277 S.W.3d 34, 39–40 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 608(b)).

10

App. 2009). Specifically, this rule provides:

> In impeaching a witness by proof of circumstances or statements showing bias or interest on the part of such witness, and before further cross-examination concerning, or extrinsic evidence of, such bias or interest may be allowed, the circumstances supporting such claim or the details of such statement, including the contents and where, when and to whom made, must be made known to the witness, and the witness must be given an opportunity to explain or to deny such circumstances or statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits such bias or interest, extrinsic evidence of same shall not be admitted. A party shall be permitted to present evidence rebutting any evidence impeaching one of said party's witnesses on grounds of bias or interest.

TEX. R. EVID. 613(b).

Nothing in this record shows that defense counsel was prevented from impeaching Robertson by use of extrinsic evidence to show her bias or interest. Defense counsel was allowed to cross-examine her concerning whether she entered into a plea agreement with the State in exchange for her testimony against Reyna. We hold there was no violation of rule 613(b). Issue seven is overruled.

**E. Improper Investigation**

In issue nine, Reyna contends that the State's "improper investigation" denied him due process and a fair trial. He calls our attention to articles 2.01 and 2.03(b) of the Texas Code of Criminal Procedure. Article 2.01 states, in relevant part: "It shall be the primary duty of all prosecuting attorneys, . . . not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused." TEX. CODE CRIM. PROC. ANN. art. 2.01 (West 2005). Article 2.03(b) states, in relevant part: "It is the duty of the trial court, the attorney representing the

11

accused, the attorney representing the state and all peace officers to so conduct themselves as to insure a fair trial for both the state and the defendant, not impair the presumption of innocence, . . . ." *Id.* § 2.03(b). Reyna argues the State failed to call Debra Oscar and Ricardo Reyes to testify at an examining trial and at the guilt-innocence phase of his trial.

We note that defense counsel did not object to the State's failure to call either Oscar or Reyes as witnesses. Thus, the complaint is not preserved for appellate review. *See* TEX. R. APP. P. 33.1. Nevertheless, the evidence showed that Oscar and Reyes were present in the vacant lot before, during, and after Licoscos's murder. Even though the appellate record does not indicate why the State did not call them to testify, Kimberly Powell testified Reyes was "passed out drunk" and was not involved in the fight between Reyna and Licoscos. Officer Rodriguez, while at the crime scene, contacted Oscar and Reyes. He stated that Oscar "was passed out[,]" and Reyes "was very, very intoxicated" and "had no clue what was going on."

Thus, it is reasonable to conclude that the prosecution may have determined that because of their intoxication, Oscar and Reyes were incapable of testifying about the events surrounding Licoscos's murder. Consequently, neither would have any information establishing Reyna's innocence. The State's failure to call them as witnesses could not have constituted suppression of facts or the secreting of witnesses by the State. In addition, there is no evidence to show that the State secreted these witnesses or suppressed any facts. We hold there is no violation of articles 2.01 or 2.03(b). Issue nine is overruled.

12

**F. Denial of Pretrial Application for Writ of Habeas Corpus**

In issue ten, Reyna contends the trial court abused its discretion in denying his amended application for writ of habeas corpus.

### 1. Background

On August 28, 2007, the trial court held a hearing on Reyna's pro se, pretrial amended application for writ of habeas corpus. During the hearing, Reyna told the trial court that he was "claiming three grounds" for relief. First, he complained he did not receive an examining trial. Second, he complained he was not served with a certified copy of the indictment.[3] And, third, he complained that on March 29, 2007, he filed a pro se, pretrial application for writ of habeas corpus, "and the State failed to exercise its due diligence and issue a process writ of habeas corpus, setting an immediate speedy hearing on the merits and rule on the writ. . . ." After hearing Reyna's complaints, the trial court denied relief.

### 2. Standard of Review and Applicable Law

We review a trial court's decision to grant or deny a writ of habeas corpus for an abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *Jaime v. State*, 81 S.W.3d 920, 925 (Tex. App.—El Paso 2002, pet. ref'd). To prevail on a writ of habeas corpus, the proponent must prove the allegations by a preponderance of the evidence. *Ex parte Cummins*, 169 S.W.3d 752, 757 (Tex. App.—Fort Worth 2005, no pet.); *see Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995).

---

[3] *See* TEX. CODE CRIM. PROC. ANN. arts. 25.01, 25.02 (West 2009) (requiring that the accused in every felony case be served with a certified copy of the indictment).

13

An accused "may use a pretrial writ of habeas corpus only in very limited circumstances." *Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005); *see Ex parte Weise*, 55 S.W.3d 617, 619 (Tex. Crim. App. 2001). The accused may: (1) "challenge the State's power to restrain him at all;" (2) "challenge the manner of his pretrial restraint, *i.e.*, the denial of bail or conditions attached to bail;" and (3) "raise certain issues which, if meritorious, would bar prosecution or conviction." *Smith*, 178 S.W.3d at 801. A pretrial writ of habeas corpus may also be used "to challenge the jurisdiction of the court if the face of the indictment shows that any prosecution is barred by the statute of limitations." *Id.* at 802. "[A] pretrial writ application is not appropriate when resolution of the question presented, even if resolved in favor of the applicant, would not result in immediate release." *Weise*, 55 S.W.3d at 619.

### 3. Analysis

With respect to Reyna's complaint that he was not served with a certified copy of the indictment, we note that on December 7, 2006, the trial court held an arraignment during which the presiding judge asked Reyna, "Have you received a copy of the indictment that was filed against you?" To this, Reyna said, "Yes, Your Honor. On November the 30th." The judge read the indictment to Reyna and then asked him if he understood "what the State is accusing you of?" Reyna replied in the affirmative and pleaded "[n]ot guilty[.]" Reyna did not inform the trial court that the copy of the indictment was not certified. Furthermore, he does not show that the purported failure to serve him with a certified copy of the indictment "would have resulted in his immediate release." *See id.*

14

Concerning his failure to receive an examining trial, the code of criminal procedure provides, in relevant part: "The accused in any felony case shall have the right to an examining trial *before indictment*. . . ." TEX. CODE CRIM. PROC. ANN. art. 16.01 (West 2005) (emphasis added). At the time the trial court heard Reyna's amended application for writ of habeas corpus, he had already been indicted and, therefore, no longer had "a right" to an examining trial. *See id.*

With regard to Reyna's original application for writ of habeas corpus, the record does not show why he did not receive an "immediate speedy hearing" or a ruling on the merits. However, even if all three grounds for relief (i.e., those grounds for relief that he raised at the hearing on his amended application for writ of habeas corpus) were resolved in his favor, he does not show how any of these grounds for relief would have either resulted in his immediate release or would have barred the prosecution against him. *See Smith*, 178 S.W.3d at 801; *Weise*, 55 S.W.3d at 619. We therefore hold the trial court did not abuse its discretion in denying relief. Issue ten is overruled.

## G. Motion to Suppress

In issue eleven, Reyna contends the trial court abused its discretion by denying his motion to suppress.

### 1. Standard of Review

In reviewing the trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). Appellate courts

15

"should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* "We conduct a *de novo* review of evidence when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor." *St. George*, 237 S.W.3d at 725 (citing *Guzman*, 955 S.W.2d at 89). We review the trial court's decision for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *Id.* We will sustain the trial court's ruling if the ruling "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). The "deferential standard of review in *Guzman* also applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing." *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).

When a trial court makes explicit fact findings, we determine "whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We then review "the trial

16

court's legal ruling *de novo* unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling." *Id.*

## 2. The Suppression Hearing

During the suppression hearing, Reyna sought to suppress all statements that he made to the police on the grounds he did not knowingly, intelligently, and voluntarily waive his rights under article 38.22 of the Texas Code of Criminal Procedure. Reyna did not testify at the suppression hearing, and the defense did not call any witnesses to testify on his behalf.

### a. Reyna's Video-taped Statement

In the afternoon following Licoscos's murder, Reyna gave a video-taped statement to Detectives Garcia and Revis. A videotape of the statement was played for the trial court during the suppression hearing. It showed that before the detectives began interrogating Reyna, Detective Revis gave him a preprinted form that contained the warnings[4] required by article 38.22 of the Texas Code of Criminal Procedure. Detective Revis read the warnings to Reyna, and after reading each warning, he asked Reyna if he understood that particular warning. Reyna answered in the affirmative each time Detective Revis asked him if he understood the particular waning, and Reyna wrote his initials next to each of these warnings. After Detective Revis finished reading the

---

[4] The warnings contained on the preprinted form are as follows: (1) "You have the right to remain silent and not make any statement at all;" (2) "Any statement you make may be used as evidence against you in court;" (3) "You have the right to have a lawyer present to advise you prior to and during any questioning;" (4) "If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning;" and (5) "You have the right to terminate the interview at any time."

warnings to Reyna, he asked Reyna two separate questions:[5] "Do you understand these rights?" and "Do you understand that you are being video recorded?" In response to each question, Reyna stated that he understood, and he wrote his initials next to each question. Afterwards, the detectives began interrogating him about the murder. The videotape showed that Reyna did not ask for a lawyer and that he did not ask to terminate the interview.

### b. Detective Garcia's Testimony

In the morning following Licoscos's murder, Officer Felts notified Detective Garcia that he had placed Reyna in the back seat of his patrol car. Detective Garcia went to that location and asked Reyna if he wanted to talk to him at the police station. Reyna agreed to go to the police station. Reyna was taken to the station, where he gave his video-taped statement. Detective Garcia testified that before they began the interrogation, Detective Revis gave Reyna the preprinted form[6] and read the warnings to him. Detective Garcia stated that Reyna understood his rights and that Reyna wrote his initials next to each right, indicating he understood them. At the bottom of the preprinted form above the signature line appeared the following paragraph: "I HAVE KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED THE RIGHTS LISTED ABOVE AND I HAVE NOT BEEN COERCED, PROMISED ANYTHING, OR THREATENED BY ANYONE TO MAKE THIS STATEMENT." The videotape showed that neither detective read that statement to Reyna prior to beginning the interrogation. Furthermore,

---

[5] These two questions appear on the preprinted form immediately below the five warnings.

[6] During the suppression hearing, the trial court admitted the preprinted form into evidence as State's exhibit 1.

18

Detective Garcia testified the aforementioned statement was never read to Reyna, and Reyna's initials do not appear next to it.

Detective Garcia stated Reyna did not ask for a lawyer and that he did not ask to terminate the interview. In addition, Detective Garcia testified he neither intimidated nor threatened Reyna. When the prosecutor asked Detective Garcia, "He [Reyna] did give a statement on that video that he thoroughly understood his Miranda warnings, correct?", he said, "That's correct." Next, the prosecutor asked him, "And that he [Reyna] waived them[?]", he said, "Yes, sir."

Detective Revis testified he read the warnings on the preprinted form to Reyna, who placed his initials at the left of each warning. He testified Reyna gave no "indication that he was being forced to comply" or that "this was involuntary." Reyna never told Detective Revis that "he was being threatened[.]" He testified he was in the process of obtaining Reyna's arrest warrant "at or around the time" Reyna "made contact with Officer Felt" and "being taken to the [police] station . . . ." Detective Revis testified Reyna gave no "indication that the statement he was making was in any way involuntary[.]"

After hearing the testimony and arguments from both sides, the trial court denied the motion to suppress. We set out in full the trial court's findings of fact and conclusions of law as follows:

The Court makes the following findings of fact:

1. The Defendant voluntarily accompanied Detective R.L. Garcia to the police department.

2. The Defendant was told that he was free to leave.

3. The Defendant never requested to leave.

4. Detective TK Revis informed the defendant he had a right to remain silent and not make any statement, that any statement made could be used as evidence against him in court, that he had the right to hire a lawyer and have a lawyer present prior and during any questioning, that he could have an appointed lawyer if he could not afford one, and that he could terminate the interview at any time.

5. The defendant acknowledged his rights by placing his initials on the rights sheet.

6. The defendant acknowledged on the sheet that he understood his rights and knew he was being video recorded.

7. The Defendant did not ask for a lawyer.

8. The Defendant was not threatened or intimidated.

The Court makes the following conclusions of law:

1. The Defendant was not under arrest at the time his statement was given.

2. The Defendant was informed of his rights under Miranda and Texas Code of Criminal Procedure, article 38.22.

3. The Defendant's statement was voluntarily given.

## 3. Applicable Law and Analysis

### a. Whether Detectives Garcia and Revis Engaged in Overreaching

A confession is involuntary under the Due Process Clause "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1999). Statements that courts have found involuntary under the Due Process Clause involve the crucial element of police overreaching and involve fact scenarios in which the suspect was subjected to threats, physical abuse, or extended periods of interrogation without rest or

20

nourishment. *See Oursbourn v. State*, 259 S.W.3d 159, 170–71 (Tex. Crim. App. 2008) (collecting cases). Absent coercive police activity, a statement is not involuntary within the meaning of the Due Process Clause even if it was not the product of a meaningful choice by its maker. *Id.* at 170 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

Article 38.22 of the Texas Code of Criminal Procedure is likewise aimed at protecting a suspect from police overreaching. *Id.* at 172. Specifically, article 38.22, section 6 provides that only voluntary statements may be admitted in evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6 (West 2005). This statute works in tandem with article 38.21 of the Texas Code of Criminal Procedure, which provides that an accused's statement may be used in evidence against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion." *Id.* § 38.21. Claims of involuntariness under these statutes can be, but need not be, predicated on police overreaching of the sort required under due-process analysis. *Oursbourn*, 259 S.W.3d at 172. Under articles 38.21 and section 6 of article 38.22, we may consider, in addition to any allegedly coercive police conduct, factors such as the suspect's youth, intoxication, mental retardation, or other disability that would not raise a federal due-process claim. *Id.* at 172–73.

"'Voluntariness' under both constitutional and state law doctrines is to be measured according to the totality of the circumstances." *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989). Viewing the evidence in the light most favorable to the trial court's finding, we find nothing in this record that could reasonably be considered police overreaching of the sort that would render a statement involuntary in either the due

process or the statutory sense. Therefore, we hold that Reyna's video-taped statement was not the product of police overreaching. *See Oursbourn*, 259 S.W.3d at 170, 172–73.

### b. Whether Reyna Knowingly, Intelligently, and Voluntarily Waived His Rights

Article 38.22 "prohibits the use of oral statements made as a result of custodial interrogation unless, *inter alia,* an electronic recording is made of the statement, *Miranda* warnings are given, and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warnings." *Turner v. State*, 252 S.W.3d 571, 583 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1)–(2) (West 2005).[7] An inquiry into the waiver of *Miranda* rights has two distinct dimensions. *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001) (citing *Colorado v. Spring,* 479 U.S. 564, 573 (1987)). First, the waiver must be "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Spring*, 479 U.S. at 573). Second, the suspect must have made the waiver "'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Spring,* 479 U.S. at 573). The "Constitution does not require that a criminal suspect know and

_____

[7] Article 38.22 § 2(a) requires that an accused receive the following warnings: (1) "he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;" (2) "any statements he makes may be used against him in court;" (3) "he has the right to have a lawyer present to advise him before and during the questioning;" (4) "if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning;" and (5) "he has the right to terminate the interview at any time[.]" TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2(a) (West 2005). Article 38.22 § 3 "categorically provides, 'No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless' the five statutory conditions are met." *Nguyen v. State*, 292 S.W.3d 671, 681 (Tex. Crim. App. 2009) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)). Article 38.22 § 3(a)(2) requires that an oral statement resulting from custodial interrogation must contain a warning informing the accused of his or her rights, and that there be a knowing, intelligent, and voluntary waiver of those rights.

understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring,* 479 U.S. at 574. It is enough that a "suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

Under articles 38.21 and 38.22 and their predecessors, fact scenarios that have raised a state-law claim of involuntariness include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have knowingly, intelligently and voluntarily waived his rights; (3) the suspect lacked the mental capacity to understand his rights; (4) the suspect was intoxicated, and "did not know what he was signing"; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; and (6) "the suspect was returned to the store he broke into 'for questioning by several'" armed persons. *Oursbourn,* 259 S.W.3d at 172–73. As the sole judge of the credibility of the evidence and witnesses, the trial court had the discretion to believe the testimony of Detectives Garcia and Revis that Reyna understood his rights. The testimony and the videotape established that: (1) before Reyna made his statement, Detective Revis gave him the article 38.22 warnings on a pre-printed form; (2) Detective Revis read the warnings to him; and (3) Reyna indicated to Detectives Garcia and Revis that he understood his rights.

The videotape also showed Reyna: (1) was coherent; (2) understood what Detective Revis was saying to him; (3) was thinking clearly; (4) was calm and cooperative, not sleepy or confused; (5) never asked to speak with an attorney; and (6) never asked to

terminate the interview. Moreover, the evidence does not show that Reyna could not understand his rights because he was ill or on medication, mentally disabled, lacked the mental capacity to understand his rights, intoxicated, or under the influence of drugs. Thus, nothing in the videotape showed that Reyna did not knowingly, intelligently, and voluntarily waive his rights. The videotape presents indisputable visual evidence supporting the testimony of Detectives Garcia and Revis.

Accordingly, Reyna's contention that he did not knowingly, intelligently, and voluntarily waive his rights is not supported by the evidence. The trial court did not abuse its discretion in concluding that Reyna's video-taped statement was voluntarily given.

### c. Did Reyna Implicitly or Expressly Waive His Rights?

It is undisputed that Reyna failed to expressly waive his rights. The waiver of rights discussed in article 38.22 § 3(a)(2)[8] "may be inferred from the actions and words of the person interrogated." *Barfield v. State*, 784 S.W.2d 38, 41 (Tex. Crim. App. 1989), *overruled on other grounds, Zimmerman v. State,* 860 S.W.2d 89 (Tex. Crim. App. 1993). "A waiver may be found in an express written or oral statement or, in at least some cases, may be inferred from the actions and words of the person interrogated." *Mays v. State*, 726 S.W.2d 937, 946 (Tex. Crim. App. 1986). As the court of criminal appeals stated in *Barfield*, "[w]e do not . . . interpret the oral confession statute to require an express verbal statement from an accused that he waives his rights prior to giving the statement." *Barfield*, 784 S.W.2d at 40–41. "In reaching the voluntariness of a confession," we look

---

[8] Article 38.22, section 3(a)(2) states, "prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning[.]" TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(2).

"at the totality of circumstances." *Id.* at 41; *see also Berry v. State*, 582 S.W.2d 463, 465 (Tex. Crim. App. (Tex. Crim. App. 1979)). Examining the totality of the circumstances surrounding Reyna's video-taped statement, we note that before he made this statement, Detective Revis read him the warnings from the preprinted form and that Reyna told him and Detective Garcia he understood each warning. After Detective Revis read him the warnings, Reyna began to answer the detectives' questions. He did not ask to terminate the interview, did not ask for an attorney, and did not ask to leave. Thus, we conclude that Reyna implicitly waived his rights knowingly, intelligently, and voluntarily as required by article 38.22. *See Turner,* 252 S.W.3d at 583 (holding that defendant validly waived his rights when he understood his rights and proceeded to answer questions); *Hargrove v. State,* 162 S.W.3d 313, 318–19 (Tex. App.—Fort Worth 2005, pet. ref'd) (finding accused validly waived rights despite lack of explicit waiver); *State v. Oliver,* 29 S.W.3d 190, 193 (Tex. App.—San Antonio 2000, pet. ref'd) (finding that, despite lack of explicit waiver, accused knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder). Such an implicit waiver is valid under article 38.22 and under the United States and Texas Constitutions. *Turner,* 252 S.W.3d at 583–84. Thus, the trial court did not abuse its discretion in finding he validly waived his legal rights prior to giving his video-taped statement. Therefore, we hold the trial court did not abuse its discretion in denying the motion to suppress. Issue eleven is overruled.

25

### III. SUPPLEMENTAL BRIEF

In his supplemental brief, Reyna contends the police did not have probable cause to arrest him. We disagree.

Detectives Garcia and Revis arrested Reyna pursuant to an arrest warrant. When reviewing a magistrate's decision to issue an arrest warrant, we apply a highly deferential standard in keeping with the constitutional preference for a warrant. *Rodriguez v. State*, 232 S.W.3d 55, 59–60 (Tex. Crim. App. 2007); *Swearingen v. State*, 143 S.W.3d 808, 810–11 (Tex. Crim. App. 2004). Consequently, a reviewing court should not invalidate a warrant by interpreting the affidavit or complaint in a hyper technical manner. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *Rodriguez*, 232 S.W.3d at 59. Instead, we consider the totality of the circumstances in determining whether the magistrate had a substantial basis for concluding that probable cause existed to support the issuance of the warrant. *Gates*, 462 U.S. at 238; *Ramos v. State*, 934 S.W.2d 358, 362–63 (Tex. Crim. App. 1996).

An arrest warrant must provide the magistrate with sufficient information to support an independent judgment that probable cause existed for the warrant. *McFarland v. State*, 928 S.W.2d 482, 509–10 (Tex. Crim. App. 1996), *overruled on other grounds by Mosely v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998). The sufficiency of an affidavit for an arrest warrant is limited to the four corners of the affidavit, viewing the affidavit in a common sense and realistic manner, and recognizing the magistrate's discretion to draw reasonable inferences. *See Moss v. State*, 75 S.W.3d 132, 140 (Tex. App.—San Antonio 2002, pet. ref'd); *see also Rodriguez*, 232 S.W.3d at 61; *Davis v.*

26

*State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006).

Probable cause requires the affiant to demonstrate that there is a probability that the accused committed an offense, not that the evidence proves the suspect's guilt beyond a reasonable doubt. *Moss*, 75 S.W.3d at 140. Two of the circumstances considered when the affiant relies on an informant's representations include the informant's reliability or veracity and the basis of the informant's knowledge. *See Gates*, 462 U.S. at 233; *State v. Ozuna*, 88 S.W.3d 307, 310 (Tex. App.—San Antonio 2002, pet. ref'd); *Martin v. State*, 67 S.W.3d 340, 344 (Tex. App.—Texarkana 2001, pet. ref'd). The validity of the affidavit does not require proof of both, and a deficiency in one may be offset by a strong showing of the other. *Martin*, 67 S.W.3d at 344.

Moreover, as long as the affidavit sets forth the affiant's belief that the informant was credible or that his or her information was reliable, the affidavit need not disclose the affiant's personal observations. *Ozuna*, 88 S.W.3d at 310. The trial court considers several factors in determining the informant's credibility: (1) whether the informant presented first-hand observations; (2) the degree of detail provided by the informant; (3) whether reasonable corroboration of the informant's statement existed; and (4) whether the informant testified at the probable-cause hearing. *Id.* at 311.

In this case, the affiant, Officer T.K. Revis, stated in his affidavit, in relevant part, that he had probable cause to believe that Reyna committed the offense of murder based upon:

> 1.) Offense report 06-043709, dated 07-25-06, written by Sgt. M. Rodriguez #1074, CCPD. Report indicates that at 1:42 a.m. he responded to the 1600 block of Leopard for a stabbing. He was flagged down by Kimberly Powell in front of 1608 Leopard Street, Corpus Christi, Nueces County,

27

Texas. Powell advised that the stabbing victim was laying in the vacant lot next to the building and directed him there. Sgt. Rodriguez found the victim, later identified as Paul Licoscos had been stabbed several times and did not appear to be breathing. EMS arrived and found that the victim had no pulse. Powell advised that she was with Licoscos, Debra Oscar, Ricardo Reyes and a black male. That they were all drinking beer there in the vacant lot. Before midnight Paul and the black male got into a fist fight over the black male accusing Paul of not taking care of his girlfriend [Debra Oscar]. They shook hands and everything was fine. At about 1:20 a.m. she [Powell] was returning from the Shell station and she saw the black male stab Paul several times with a pair of scissors. She fled the area because the black male was chasing her. Paul Licoscos was transported to the Nueces County Morgue by the Medical Examiner transport.

2.) Statement's [sic] from Kimberly Powell in which she identifies Samuel Reyna, dob 04-21-54 from a 6 photo lineup of men as the man she saw stab Paul with the scissors in the back several times and the man she tried to pull off of Paul when he was stabbing him.

3.) Statement from Debra Oscar in which she indicates that before midnight she was with Paul and a guy she knew as Sam. That they were all 3 drinking beer up under 286 across from the Shell station. That is the last thing that she remembers. She identified Samuel Reyna dob 04-21-54 from a 6 photo color photo lineup of men as the man she knew as Sam.

4.) Report from Medical Examiner Dr. Fernandez which will indicate that Paul Licoscos died as a result of penetrating stab wounds to the torso.

Officer Revis signed this affidavit before a magistrate on July 25, 2006.

After considering the totality of the circumstances, we conclude that the magistrate had a substantial basis for determining that probable cause existed to support the issuance of Reyna's arrest warrant. We note that even though Officer Revis does not specifically mention anything about Powell's reliability or veracity, he does state the basis of her knowledge; i.e., he stated she was present at the scene and saw Licoscos get stabbed by Reyna. She identified Reyna from a photo lineup as the person she saw stab Licoscos several times. In addition, Oscar's statement showed that prior to Licoscos's

28

murder, she was with him and a man who she knew as "Sam." She identified "Sam" from a photo lineup as Samuel Reyna.

Moreover, Officer Revis noted that Officer Rodriguez had been "flagged down" by Powell, who directed him to the location of Licoscos's body. Officer Rodriguez saw that Licoscos had been stabbed and did not appear to be breathing. In *Davis v. State*, the court of criminal appeals stated that "[o]bservations reported to the affiant by other officers engaged in the investigation can constitute a reliable basis for issuing a warrant." 202 S.W.3d 149, 156 n.20 (Tex. Crim. App. 2006) (citing *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965)).

Viewing the affidavit in a common sense and realistic manner, and recognizing the magistrate's discretion to draw reasonable inferences, we conclude the affidavit provided the magistrate with sufficient information to support an independent judgment that probable cause existed to support the issuance of the warrant. The supplemental issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
4th day of August, 2011.